IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH LYNN PERDEW,                           No. 6:16-cv-01588-HZ

        Plaintiff,

    v.

NANCY A. BERRYHILL, Acting                     OPINION & ORDER
Commissioner of Social Security,

        Defendant.


Katherine L. Eitenmiller
Brent Wells
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401

        Attorneys for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY

1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Martha A. Boden
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, Washington 98104-7075

       Attorneys for Defendant

HERNANDEZ, District Judge:

       Plaintiff Deborah Perdew brings this action seeking judicial review of the

Commissioner's final decision to deny disability insurance benefits (DIB). This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). Defendant concedes that the denial decision must be

reversed and remanded. The parties, disagree, however, as to whether remand should be for

additional proceedings or for an award of benefits. Because I agree with Plaintiff, I reverse the

Commissioner's decision and remand for benefits.

STANDARD OF REVIEW

       A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings are based on legal error or are not supported by substantial evidence in

the record as a whole. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal

quotation marks omitted). The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v.

Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than

one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

### I. Plaintiff's Arguments re: ALJ Errors

In her Opening Memorandum, ECF 15, Plaintiff argues that the Administrative Law Judge (ALJ) made three errors in adjudicating her disability claim. First, she contends that the hypothetical given by the ALJ to the vocational expert (VE) was incomplete. Second, she contends that the ALJ improperly rejected the opinion of her treating physician. Third, she argues that the ALJ improperly found her subjective testimony not credible.

As to the first argument, she notes that the ALJ gave "great weight" to the opinions of two state agency non-examining consultants, Sharon Meyers, D.O., and Martin Kehrli, M.D. Tr. 26. Although both of these practitioners concluded that Plaintiff did not meet the standards for establishing disability, they nonetheless recommended that Plaintiff, who has Crohn's disease, have "close proximity to a private bathroom due to frequent and at times unexpected bowel movements" to be able to work. Tr. 74, 87. The ALJ found their opinions "consistent with the medical evidence as a whole." Tr. 26. However, the ALJ failed to include the need for a private bathroom in her hypothetical to the VE and in her residual functional capacity (RFC). Tr. 24 (including in the RFC that Plaintiff have "easy access to a bathroom (within 45 feet of her work station)[.]"); Tr. 60 (posing hypothetical to the VE which included the requirement of "close proximity" to a bathroom and defining "close proximity" to require up to forty-five feet).

Plaintiff notes that this private bathroom limitation is consistent with the opinion of examining psychologist Manuel Gomes, Ph.D., who stated that "[w]ith the proper conditions," Plaintiff could maintain a regular work schedule.  Tr. 412.  Those conditions included a nearby bathroom and an environment allowing her to be "devoid of opportunities to feel embarrassed." Tr. 411, 412.

Plaintiff argues that the ALJ's failure to account for the private bathroom limitation contained in the two opinions credited by the ALJ, resulted in a defective hypothetical and VE testimony which cannot support the ALJ's determination.  *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009) (VE expert opinion evidence is reliable if the hypothetical sets out all the limitations and restrictions of the particular claimant); *Nguyen v. Chater*, 100 F.3d 1462, 1466 n.3 (9th Cir. 1996) (an incomplete hypothetical cannot "constitute competent evidence to support a finding that claimant could do the jobs set forth by the vocational expert").

II.  Defendant's Response and Concession of Error

In her Response Memorandum & Motion to Remand, ECF 22, Defendant concedes that the ALJ erred in her consideration of the opinions of Dr. Meyers and Dr. Kehrli.  Defendant acknowledges that Dr. Meyers and Dr. Kehrli each recommended that Plaintiff have "close proximity to a private bathroom" and that the ALJ did not adopt that limitation into the RFC which provided only for "easy access" to any bathroom within forty-five feet of Plaintiff's work station.

Despite these acknowledgments, Defendant does not actually concede that the ALJ erred by omitting the private bathroom limitation contained in the opinions wholly credited by the ALJ, from the VE hypothetical and the RFC.  Instead, Defendant states that the "ALJ's evaluation

of these medical opinions did not achieve the level of specificity the courts in this circuit have required for evaluating medical opinion evidence." Def.'s Resp. Mem. & Mot. for Remand 4. And, even though Plaintiff did not raise error regarding the ALJ's treatment of Dr. Gomes's opinion, Defendant "concedes" that the ALJ's evaluation of Dr. Gomes's opinion also did not meet the specificity requirements. *Id.*[1]

If Plaintiff's argument were that the ALJ improperly rejected the opinions of these practitioners, Defendant's concession would make more sense. Defendant's characterization of the ALJ's error as failing to provide the level of sufficiency required to evaluate these practitioners' opinions is a response to an argument that the ALJ failed to give legally sufficient bases to reject those opinions. But that is not the argument presented, because here, the ALJ did not reject those opinions. Instead, the ALJ credited them. The ALJ's error was in failing to adequately account for the fully credited opinions in her VE hypothetical and RFC.

Based on the articulated response and concession of error, Defendant then argues that remand for further proceedings is required because it would allow the ALJ to "articulate her reasons for discounting these opinions." *Id.* But, to repeat, these are opinions that the ALJ has already fully credited. Defendant offers no support for its position that an ALJ's failure to

---

[1] Defendant is correct that the ALJ did not expressly accept or reject Dr. Gomes's opinion but the ALJ's discussion clearly shows that she credited the opinion. Tr. 22-23. The ALJ found that Plaintiff's depression did not cause more than minimal limitation in her ability to perform basic mental work activities and was therefore nonsevere. Tr. 22. In support of this finding, the ALJ discussed Plaintiff's treatment record and then Dr. Gomes's November 2013 evaluation. *Id.* The ALJ noted Dr. Gomes's assessment of persistent depressive disorder with anxious distress and adjustment disorder with mixed anxiety and depressed mood. *Id.* But, the ALJ also cited to Dr. Gomes having found no evidence that Plaintiff would have difficulty maintaining a work schedule if she were located near a bathroom. Tr. 23. Given the ALJ's final disability determination based on the RFC which included a limitation of close proximity to a bathroom, it is apparent that the ALJ relied on Dr. Gomes's opinion and thus credited it.

include a limitation in an opinion the ALJ has expressly credited and has found to be consistent

with the medical evidence provides an opportunity for the ALJ upon remand to articulate reasons

to reject those opinions.  Case law from the Ninth Circuit suggests that what is effectively a "do

over" for the ALJ is inappropriate.  *E.g.*, *Benecke v. Comm'r*, 379 F.3d 587, 595 (9th Cir. 2004)

("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win;

tails let's play again' system of disability benefits adjudication"); *Moisa v. Comm'r*, 367 F.3d 882,

887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another

opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an

opportunity for remand and further proceedings to establish his credibility.").

The type of error that occurred here prompts the question of whether the record

establishes disability when the erroneously omitted limitation is included in the VE hypothetical.

If it is, then remand for benefits is appropriate if there are no other outstanding issues.  If it is not,

then remand for additional proceedings is required.  *See, e.g., Garrison v. Colvin*, 759 F.3d 995,

1020 (9th Cir. 2014) (three-part test is used to determine which type of remand is appropriate;

explaining that when the record is fully developed, further administrative proceedings would

serve no useful purpose, and crediting of the improperly omitted evidence would require the ALJ

to find the claimant disabled, court should remand for an award of benefits).

Here, the VE testified that a private bathroom could not be accommodated in competitive

employment.  Tr. 62, 63.  The ALJ made clear that Plaintiff's testimony was that she had a

"private bathroom by default because no other women were employed there."  *Id.*  Plaintiff's

counsel understood that to be Plaintiff's testimony but noted he was inquiring about jobs as they

are generally performed.  Tr. 62-63.  The VE then confirmed that a private bathroom is not

accommodated in competitive employment. Tr. 63. Given the credited opinions of Dr. Meyers and Dr. Kehrli which included the limitation of a private bathroom, the VE's testimony supports a finding of disability. Even assuming the VE testimony does not establish disability, however, Plaintiff's testimony and the opinion of her treating gastroenterologist, both of which the ALJ improperly rejected, support a remand for benefits.

### III. Plaintiff's Credibility

Plaintiff testified that she takes three medications for her Crohn's disease. Tr. 47. She described them as initially effective but then failing. Tr. 48, 49. Even with medication, she suffers from "massive diarrhea" and has problems controlling it. Tr. 48. At the time of the hearing, she had accidents about once or twice each week. *Id.*; *see also* Tr. 52 (accidents occur even when taking all medications). Aside from the accidents, she still experiences having five or six semi-formed stools each day, usually in the morning and the evening. Tr. 48-49. Some days, up to one to two days per week, the frequency is higher. Tr. 54. The normal pattern is morning and evenings but her need to use the bathroom still occurs unexpectedly during the day. Tr. 54-55.

On normal days when she uses the bathroom she takes about fifteen minutes each time. Tr. 53. Stress or the lack of access to a bathroom can increase her need for a bathroom. Tr. 55. If she has a "disaster," it takes longer than fifteen minutes to clean up. Tr. 53. Plaintiff testified that the number and length of her bathroom visits at the time of the hearing was consistent with what she experienced while working. Tr. 56. But, because she had been with the company for a long time, she was allowed to take the bathroom breaks she needed. *Id.*

Plaintiff described her work as a dispatcher for an electric company for sixteen years until

the company closed its Eugene office in July 2012. Tr. 44-45. She noted that she was the only woman on the job and as a result, had exclusive use of the women's restroom. Tr. 46. Plaintiff deliberately positioned her desk only fifteen feet from that bathroom. *Id.* But, even still, she had a couple of accidents at work. Tr. 56. Because of the occasional "full on" accident (meaning more than soiling her undergarments), she kept a change of clothes in that bathroom. Tr. 53. In that event, she would put the dirty clothes in a bag and take them to her car. *Id.* She has also had accidents in public, for example in a store, occurring approximately three to four times per year the past couple of years. Tr. 55. These experiences were humiliating. *Id.*

She does not have difficulty performing familiar tasks. Tr. 47-48. She can bathe and dress herself without help. Tr. 51. She does basic cooking, loads the dishwasher, and can do laundry with the help of her granddaughter. *Id.* She occasionally goes to the store for about thirty minutes and goes to church about once per month. Tr. 51, 52. She suffers from joint pain and fatigue associated with her Crohn's disease. Tr. 57. Her activities are restricted as a result. Tr. 57-58.

The ALJ found that the record did not support Plaintiff's allegations of symptoms and resulting limitations. Tr. 25. The ALJ's reasons are not altogether clear, but it appears that she relied on the following: (1) Plaintiff's symptoms were managed with medication and her disease was stable; (2) Plaintiff was able to work despite her symptoms; (3) Plaintiff's job ended for reasons unrelated to her disability; (4) Plaintiff failed to consistently take her medications; (5) Plaintiff misrepresented the nature of the restroom she accessed during her employment; and (6) during the hearing, Plaintiff "amended" her testimony after exaggerating the number of bowel movements she has per day. Tr. 25-26.

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in a 2012 case,

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (citations and internal quotation marks omitted).

The ALJ's determination that Plaintiff's disease is stable and her symptoms were managed with medication overlooks the record as a whole, and relies instead on exhibits taken out of context indicating that at a particular moment in time, Plaintiff's symptoms were controlled. The first record cited by the ALJ is from Plaintiff's rheumatologist before her alleged onset date. Tr. 227 (Aug. 10, 2011 chart note). That physician noted that Plaintiff's Crohn's disease was "quiet" and "well managed" on Cimzia and diet. *Id.* This record, however, must be understood in the context of the medical evidence both before and after August 2011.

A review of Plaintiff's gastroenterology records shows that in 2010, her symptoms were under "acceptable control" on Cimzia and Imuran, although she still had fairly frequent bowel movements and needed Prednisone to treat her intermittent flare ups. Tr. 238. In October 2010, she had symptoms of a bowel obstruction with sharp pain, nausea and vomiting, along with episodes of watery diarrhea. Tr. 239. She started Prednisone and the symptoms resolved in a few days. Tr. 240. She then decreased the Prednisone and again experienced upper quadrant abdominal discomfort. Tr. 241. She continued to have diarrhea which Dr. Phillips noted was her "baseline." *Id.* She was instructed to continue to take Prednisone. Tr. 242. However, after decreasing the dose as instructed, she woke up a few weeks later in severe pain and with watery bowel movements and was worried again about a bowel obstruction. Tr. 244. Dr. Phillips increased the Prednisone again. *Id.* Plaintiff experienced another flare-up, serious enough to require hospitalization, in January 2011. Tr. 246-47. Although she was taking Cimzia and Imuran at the time and generally had "good stability," she still had this serious episode. Tr. 246, 247 (noting further that she had been on "different agents for her Crohn's and has failed most of them" but was currently on Cimzia and Imuran with as needed use of Prednisone). Thus, despite

medication, she continued to experience serious flare ups of her Crohn's disease. *Id.* (admitted to hospital because of what was felt to be a "Crohn's disease flare").

In a May 3, 2011 chart entry, Dr. Phillips noted that Plaintiff's obstructive-like symptoms required hospitalization in January, but that she had responded to a moderate dose of Prednisone. Tr. 255. She was then weaned off of that medication and had been stable since. *Id.* She still had occasional symptoms of an impending obstruction but had been able to "wait out" the symptoms which then passed. *Id.* Even with the current medication regimen of Cimzia and Imuran, Dr. Phillips noted that she continued to experience arthralgias, diarrhea, and abdominal discomfort which she described as her "baseline" and which she did not enjoy. *Id.* Dr. Phillips discussed possible surgical intervention for what he thought was an episodic small bowel obstruction. *Id.* He also recommended trying a continual low-dose of Prednisone of five milligrams every other day because of her positive response to that medication. *Id.*; Tr. 267. He indicated that her disease was being "optimally managed." Tr. 257.

The following month, June 2011, Plaintiff reported that Prednisone was helping and that it decreased her joint pain. Tr. 268. She reported doing "OK" and feeling "pretty decent," with more good days than bad, but she noted that on her bad days, which she reported as one to two days per week, she experienced multiple episodes of diarrhea with mucous. *Id.* She was instructed to continue with Prednisone at that low dose. *Id.*

About two weeks after the August 10, 2011 rheumatology chart note cited by the ALJ indicating that her disease was well managed, Plaintiff reported to Dr. Phillips on August 25, 2011 that she was having another flare-up with possible obstruction. Tr. 269. She called his office because of abdominal pain, vomiting, and watery diarrhea. *Id.* She remarked she had been

"feeling great this summer" until now. *Id.* Dr. Phillips told her to increase the Prednisone again. *Id.* Then, in October 2011, Dr. Phillips noted that Plaintiff had had two episodes of possible impending obstructions "this fall," despite her taking the low-dose Prednisone as he prescribed. *Id.* Plaintiff reported never having a normal stool and feeling discouraged. *Id.* Dr. Phillips noted that she had Crohn's disease "with continuing symptoms of intermittent obstruction despite being on Cimzia, and Imuran, and prednisone 5 mg every other day." *Id.* He believed she was coming closer to needing a repeat surgery. *Id.*

Plaintiff then had a small bowel resection on January 25, 2012. Tr. 280. Dr. Phillips noted the presence of active inflammation in the resected portion of the bowel. Tr. 281. He noted that even though inflammation was not present elsewhere, he was concerned about the risk for reoccurrence because this was her second surgery for the condition. *Id.*

It was in this context that the August 10, 2011 chart note by her rheumatologist must be viewed. Although the rheumatologist described the disease as quiet and under control at that moment, the records from the prior year show that Plaintiff had stability at times but with ongoing diarrhea and one to two "bad" days per week as a "baseline," as well as flares of pain, increased diarrhea, and nausea and vomiting. The post-August 2011 records show continued flare ups of those symptoms, resulting in surgery in January 2012. Thus, the ALJ's citation to the August 10, 2011 rheumatology chart note for the proposition that Plaintiff's gastroenterology symptoms were managed with medication is not supported when the records both before and after that date are considered.

The ALJ also cited to the May 3, 2011 chart note by Dr. Phillips indicating that Plaintiff's disease was being "optimally managed" and she had had a good response to the Prednisone. This

chart note also predates Plaintiff's alleged onset date. And, as with the other evidence cited by the ALJ, this note must be viewed in context. Plaintiff achieved stability on Cimzia and Imuran, but she still had flare ups, diarrhea, and pain. Additionally, the term "optimally managed" does not suggest that the disease is without disabling symptoms. It simply means that at that moment, the disease cannot be managed any better.

The ALJ also relied on a June 2012 chart note of Dr. Phillips's to support his finding that Plaintiff's symptoms were managed with medication and that her diarrhea is "low grade" and is tolerable. Tr. 284-85. There, Dr. Phillips described the January 2012 surgery and noted that Plaintiff continued to have diarrhea which was unchanged, was fatigued, and had arthralgias. *Id.* He suggested she see her rheumatologist about some of those symptoms. *Id.* Dr. Phillips did describe her Crohn's disease as stable status post surgical resection of the small bowel. Tr. 285. He characterized her diarrhea as ongoing and low-grade, indicating she tolerates it. *Id.* He believed her disease was in remission on Cimzia. *Id.*

However, a few months later, in October 2012, Dr. Phillips noted that despite taking Cimzia, Plaintiff continued to have significant arthralgias and diarrhea as well as abdominal pain. Tr. 290. He noted that it was possible that stress was a contributing factor. *Id.* He described Plaintiff as "miserable with the arthralgias and diarrhea." *Id.* He stated that she was "not doing well with continuing diarrhea and arthralgias as well as abdominal pain." *Id.* He recommended restarting her on a low-dose of Prednisone and increasing her cholestyramine to help her diarrhea. *Id.* Two months later, Plaintiff had increased fecal leakage, mucous, and accidents along with her typical five to six loose bowel movements each day. Tr. 293. A December 2012 colonoscopy confirmed the continued presence of ulceration and erythema compatible with

active Crohn's disease, despite having had the second bowel resection earlier in the year. Tr. 301; Tr. 302 ("findings are compatible with active involvement by the patient's known Crohn's disease."). Dr. Phillips was justifiably concerned after her January 2012 surgery that her condition would reoccur.

The medical evidence both before and after the records cited by the ALJ undermines the ALJ's finding that Plaintiff's condition was successfully managed with medication and that her low-grade diarrhea was tolerable. As previously explained, while she enjoyed periods of stability while on certain combinations of medication, she continued to experience flare ups, leakage, accidents, bad days, fatigue, and pain. She underwent a second bowel surgery. Additional records contradict the ALJ's conclusions. *E.g.,* Tr. 224 (Oct. 16, 2012 rheumatology chart note stating that Plaintiff had "very active Crohn's notwithstanding CIMZIA"); Tr. 306 (Dr. Phillips Feb. 2013 chart note stating that Plaintiff generally had six to eight bowel movements per day but up to twelve on a bad day, along with right lower quadrant pain; further noting that she had "ongoing Crohn's activity" and stating that Cimzia "certainly not adequate to maintain remission"); Tr. 388 (Dr. Phillips March 2013 chart note indicating loose stools occurring in the afternoon as well as the morning and continuing to have bad days while on Cimzia); Tr. 386 (Dr. Phillips May 2013 chart note stating Plaintiff's Crohn's disease may be worsening); Tr. 427 (Dr. Phillips Jan. 2014 chart note describing Plaintiff's Crohn's disease as "active" and stating she was on "maximal medical therapy"); Tr. 419-24 (Dr. Phillips March-April 2013 chart notes indicating that a missed Cimzia medication because of a change of insurance and pharmacy resulted in flare of Crohn's, with ten to twelve stools per day; then, although she was back on Cimzia, her symptoms had not returned to baseline despite starting thirty milligrams of Prednisone per day);

Tr. 497-500 (Dec. 2014 chart note by Dr. Jonathan Gonenne, Plaintiff's treating gastroenterologist following Dr. Phillips's retirement, indicating that weaning off of Prednisone to five milligrams per day resulted in an increase of diarrhea to eight to twelve episodes per day).

The ALJ also suggested that Plaintiff's testimony was undermined by the fact that she worked despite the presence of her symptoms. Although a history of working with allegedly disabling symptoms can negatively impact a claimant's testimony, the ALJ's finding in this case fails to acknowledge that Plaintiff received critical accommodations allowing her to work. First, she located her desk only fifteen feet from the restroom. Second, because she was the only female employee, she had a *de facto* private restroom. Third, the company accommodated her need to take frequent bathroom breaks. In such circumstances, Plaintiff's characterization of her symptoms as disabling is not inconsistent with her ability to work at this particular job. The ALJ further noted that Plaintiff's employment ended for reasons unrelated to her disability. The ALJ is correct that Plaintiff maintained employment with the electrical contractor until it closed its Eugene office in July 2012. However, given the accommodations given her by the employer described above, the fact that she continued working until the company shut down cannot reasonably be used to undermine her assertion that her symptoms are disabling.

Next, the ALJ seemed to fault Plaintiff for characterizing the restroom at her work as "private." Tr. 26 (Plaintiff "gave the impression she was provided a private restroom at work. . . . However, at the hearing, [Plaintiff] testified it was in fact a regular women's restroom, but that she happened to be the only female employee[.]"). Regardless of the appropriate description, there is no dispute that this particular employee restroom was used exclusively by Plaintiff. This makes it "private," whether by design or circumstance. It was error for the ALJ to suggest that

Plaintiff's use of the term "private" was misleading.

The ALJ further faulted Plaintiff for failing to consistently take her medications.  Tr. 25 (Plaintiff "acknowledges she takes her medications as directed only about 90 percent of the time.").  An unexplained failure to follow a prescribed course of treatment may be considered in assessing a claimant's subjective testimony.  *E.g.*, *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  However, in this case, the ALJ's reliance on Plaintiff's compliance with her  medication regimen does undermine the testimony regarding the seriousness of her symptoms.  First, as the ALJ herself notes, Plaintiff takes her medications ninety-percent of the time.  By using the word "only" to modify "ninety percent," the ALJ suggests that ninety percent is minimal compliance.  I disagree.  Ninety percent is significant compliance and does not provide a reasonable basis to discount her testimony.

Second, in support of this finding, the ALJ cited to Dr. Gomes's November 2013 evaluation.  In providing her medical history, the report lists seven different medications, only three of which are directly related to her Crohn's disease.  Tr. 407 (noting Cimzia, Imuran, Prednisone, as well as Wellbutrin, nortriptyline, Xanax, and Vicodin).  Plaintiff told Dr. Gomes that she took her medications about ninety percent of the time but she did not specify which medications she was referring to.  Thus, the record is ambiguous as to whether she took some or all of the listed medications as directed.  The ALJ's finding that she was noncompliant with her Crohn's medications is not clearly supported by this record.

Third, other records do show that she occasionally missed taking Cimzia.  Once, it was because of an insurance change which delayed her taking it for one week.  Tr. 424.  Another time, Dr. Phillips instructed her to stop Cimzia in preparation for her January 2012 surgery.  Tr.

281.  She was not told to restart it until March 2012.  *Id.*  Finally, in June 2012, Plaintiff was due

for Cimzia but did not realize she was out of refills.  She was unable to get a refill until she had a

repeat tuberculosis test which she had not yet done.  Tr. 289.  She then had the tuberculosis test

and Dr. Phillips's office authorized one month of Cimzia refills pending the tuberculosis test

results.  *Id.*  It is unclear if she actually missed any doses of the medication.

Overall, Plaintiff showed significant compliance with her prescribed medications.  The

record cited by the ALJ is ambiguous as to which medications she was referring to when she said

she took them ninety percent of the time as prescribed.  Even assuming she meant the Crohn's

disease medications, this is a significant compliance rate.  Furthermore, the instances in the

record in which she missed Cimzia are explained.  The ALJ erred by discrediting Plaintiff's

testimony because she was compliant with her medications less than 100% of the time.

Next, the ALJ stated that Plaintiff's testimony changed during the hearing about the

frequency of her bowel movements.  Tr. 26.  The ALJ stated that initially, Plaintiff testified that

she had accidents of uncontrolled diarrhea while working and needed to change her clothes

frequently.  *Id.*  Then, according to the ALJ, toward the end of the hearing Plaintiff "amended her

testimony" to explain that this happened only a couple of times.  *Id.*  The ALJ remarked that

Plaintiff testified she experiences one two accidents per week at home which can be serious

enough to require a change of clothing.  *Id.*  The ALJ concluded this part of her discussion by

stating that the medical evidence did not show that Plaintiff had reported an increase in accidents

since she stopped working.  *Id.*

Early in the hearing, the ALJ asked Plaintiff what kept her from working at this time.  Tr.

48.  Plaintiff responded that her biggest problem was "massive diarrhea and controlling it."  *Id.*

She added that she had "accidents quite often." *Id.* When the ALJ inquired how often was "quite often," Plaintiff responded that "right now," it was "once to twice a week." *Id.* She then testified that as of December 2014, while on Prednisone, she had five to six semi-formed stools per day, mostly in the morning and evening. Tr. 48-49. Plaintiff stated that this was the same pattern she had while working. Tr. 49. The ALJ confirmed that changes in medication increased the frequency. *Id.* Plaintiff's current medication regimen was not controlling her symptoms and her new gastroenterologist had scheduled her for a colonoscopy as a result, with the possibility of changing medications again. *Id.* Continuing with Prednisone increased the risk of bone loss. *Id.*

Plaintiff testified that the once to twice weekly accidents occurred despite taking all of her medication. Tr. 52. She explained that this had been going on for four to five years, meaning even when she was working. Tr. 52-53. She explained that if she had an accident at work, she used the private bathroom, where she kept clean clothes, to change. Tr. 53. Upon questioning from the ALJ, she clarified that her baseline of five to six semi-formed bowel movements per day was in a twenty-four hour period. *Id.* While she said, again, that typically, her bathroom need was greatest in the morning and the evening, she explained she still had occasions when she unexpectedly needed to use the bathroom during the day. *Id.* She regularly had one to two days per week where her need was more than five to six times per day. *Id.* She also testified that she had experienced accidents in stores five times in the past year and three or four times in the year before. Tr. 55. Plaintiff agreed that the number and length of her bathroom visits was the same as when she had been working. Tr. 56. But, her job, as she previously described, allowed her take the breaks she needed. *Id.* And, even though the bathroom was close, she still had a couple of accidents at work. *Id.*

Plaintiff did not amend her testimony during the hearing. She consistently testified that her bowel movement and bathroom use frequency was the same now as it was at the time of the hearing. She explained that she had accidents once to twice per week, despite taking her medications as prescribed, and that this had been occurring for four to five years. Importantly, she did *not* state that she had accidents once to twice per week *at work*. Rather, her testimony was that she had problems controlling her diarrhea and she had accidents once to twice per week, with some occurring in stores and a couple at work. If the accident occurred at work, she was ready with a change of clothes stored in the women's restroom. The testimony was straightforward and consistent. The ALJ erred in finding Plaintiff not credible based on her hearing testimony.

None of the reasons given by the ALJ for rejecting Plaintiff's testimony are supported by substantial evidence in the record. The ALJ misinterpreted Plaintiff's hearing testimony, failed to consider the medical evidence as a whole, failed to account for the unique accommodations provided by her employer when she was working, and unreasonably concluded she could not be believed because she took her medications as prescribed ninety percent of the time. Accordingly, the ALJ erred in concluding that Plaintiff's limitations testimony was not credible.

IV. Dr. Phillips's Opinion

Dr. Phillips was Plaintiff's treating gastroenterologist for several years. In June 2014, he completed a medical evaluation of Plaintiff in which he stated that she had Crohn's disease which, because it is a lifelong condition, would be expected to last at least twelve months. Tr. 440. Her symptoms included severe abdominal and rectal pain, diarrhea, and muscle and joint pain. Tr. 441. Relevant clinical findings supporting his statements regarding her disease and

symptoms included prior small bowel x-ray showing marked thickening of the small bowel, a CT scan showing Crohn's disease, as well as recent laboratory findings. Tr. 441. Her current medications were Imuran and Cimzia. *Id.* Dr. Phillips opined that Plaintiff's fatigue would cause her to rest periodically during the day for several hours. *Id.* He also believed that more than four days per month, Plaintiff's impairments would prevent her from being able to maintain a regular work schedule of eight hours per day, five days per week, with normal breaks of ten to fifteen minutes once in the morning and once in the afternoon, and a lunch break of thirty to sixty minutes. Tr. 443.

The ALJ rejected this opinion, finding that (1) Dr. Phillips made no mention of Plaintiff's functional status as of her alleged July 2012 onset date or the intervening two years; (2) the opinion was based on Plaintiff's self-report; (3) Plaintiff did not miss more than four days of work per month when employed. Tr. 26.

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. *Ghanim*, 763 F.3d at 1160-61.

Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record. *Id.* at 1161; *Bayliss v. Barnhart*, 427

F.3d 1211, 1216 (9th Cir. 2005).  The weight accorded a treating physician's opinion depends on the length of the treatment relationship, the frequency of visits, and the nature and extent of treatment received.  *Ghanim*, 763 at 1161; *Orn*, 495 F.3d at 632-33; 20 C.F.R. §§ 404.1527(c)(2)(i), (ii), 416.927(c)(2)(i), (ii).  Additionally, opinions from specialists related to that person's speciality are afforded more weight.  *Garrison*, 759 F.3d at 1013; *Benecke*, 379 F.3d at 594 n.4; 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

A physician's opinion based on a claimant's self-report of symptoms may be rejected if the claimant's subjective testimony is not credible.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ did not err in rejecting medical opinions based on subjective complaints); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995) (a medical opinion which is "premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded, once those complaints have themselves been properly discounted.").  Here, because the ALJ improperly discredited Plaintiff's testimony, the ALJ may not discount Dr. Phillips's opinion for it being based in part on Plaintiff's self-report of symptoms.

The ALJ is correct that the record does not show that Plaintiff missed four days of work per month.  However, this is not a valid reason to reject Dr. Phillips's opinion.  First, as previously explained, Plaintiff's employment gave her unique accommodations.  It is unreasonable to compare her ability to work in other settings with her prior ability to work in a distinctive environment and with no restrictions on the frequency with which she used the bathroom.  Second, Dr. Phillips's opinion does not necessarily state that she would miss more than four whole days of work per month.  The question on the form asked how often Plaintiff's impairments would be severe enough to preclude a regular work schedule.  Tr. 443.  "Normal

work schedule" was then defined to mean five days a week of eight hours per day, as well as two ten to fifteen minute breaks each day plus lunch. *Id.* Dr. Phillips responded "[m]ore than 4 days per month." Thus, according to Dr. Phillips, more than four days per month Plaintiff's impairments would preclude her from working a full eight hours and/or adhering to the two short breaks plus lunch daily schedule. His opinion does not make clear if it is based on the inability to work five, eight hour days, or the inability to work with only two short breaks plus lunch, or both. Given this and Plaintiff's particular work accommodations, the ALJ erred in rejecting Dr. Phillips's opinion because Plaintiff did not miss four days of work each month.

Finally, I agree with Plaintiff that the ALJ's rejection of Dr. Phillips's opinion because it did not specifically address her functioning as of her July 2012 alleged onset date or thereafter, is inconsistent with the ALJ's own finding that Plaintiff's symptoms had not changed or worsened since she stopped working. Tr. 26 ("[H]er symptoms have not changed significantly since she stopped working."). If Plaintiff's symptoms are unchanged, then Dr. Phillips's assessment in June 2014 should apply to the entire period of July 2012 to June 2014. The ALJ was wrong to conclude otherwise.

Dr. Phillips is a specialist who had a longstanding treating relationship with Plaintiff. His opinion is entitled to considerable weight unless rejected for "specific and legitimate" reasons supported by substantial evidence in the record. The ALJ's rejection of Dr. Phillips's opinion does not meet that standard.

When the improperly discredited evidence of Plaintiff's testimony and Dr. Phillips's opinion is credited, the ALJ would be required to find Plaintiff disabled. No additional administrative proceedings would be useful. Thus, a remand for benefits is required.

CONCLUSION

The Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

Dated this ____16____ day of ____November____, 2017


_____
Marco A. Hernandez
United States District Judge